**Ernest STICH and Miriam Stich, Appellants,**

v.

**UNITED STATES of America.**

No. 83–5343.

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1984.

Decided March 19, 1984.

Rehearing and Rehearing In Banc Denied April 23, 1984.

---

Robert P. Casey (argued), Constance B. Foster, Alexandra D. Sandler, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., Louis J. Bizzarri (argued), Asst. U.S. Atty., W. Hunt Dumont, U.S. Atty., Trenton, N.J., for appellee.

Dennis A. Drazin, Thomas J. DiChiara, John R. Connelly, Jr., Drazin & Warshaw, P.A., Red Bank, N.J., for appellants.

Before HUNTER and WEIS, Circuit Judges, and DUMBAULD,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This case arose from the campaign of the United States to inoculate its population against the Swine Influenza virus. Nine days after receiving a Swine Flu vaccination, Miriam Stich ("Mrs. Stich") became seriously ill. Claiming that she had contracted Guillian-Barre Syndrome ("GBS") or some other disease causally related to the Swine Flu shot, Mr. and Mrs. Stich filed suit against the United States. The United States argued that Mrs. Stich suffered from Herpes Simplex Encephalitis ("HSE"), a disease believed to be unrelated to Swine Flu vaccinations. After a lengthy and complex bench trial, the district court held that plaintiffs had not sustained their burden of proving that Mrs. Stich contracted GBS or some other disease caused by the Swine Flu shot, and entered judgment in favor of the United States. Plaintiffs appeal on a number of grounds. We find no error in the trial court proceedings, and will affirm the judgment of the district court, 565 F.Supp. 1096.

### I.

Mrs. Stich received a Swine Flu shot on November 18, 1976. On November 22, 1976 she began to feel ill, suffering from a fever, muscle aches, a headache and general malaise. The family physician, Dr. Joseph Gluck, saw Mrs. Stich at home on November 26th. Although she felt quite unwell, the physical examination revealed nothing remarkable. Dr. Gluck prescribed rest and aspirin.

On November 27, 1976, Mrs. Stich's condition took a dramatic turn for the worse. She was admitted to the Emergency Room of Riverview Hospital in New Jersey completely unconscious, with convulsions and a fever. During her convulsive state, Dr. Gluck noted that Mrs. Stich showed physical signs of decerebration. Dr. Gluck diagnosed the problem as meningoencephalitis of unknown etiology.

For the next three or four days, Mrs. Stich's level of consciousness varied substantially, although she never completely recovered. By December 2, 1976, she was totally unconscious and unresponsive, and she remained comatose or semi-comatose for the next three to four months.

On February 14, 1977, Mrs. Stich was transferred to the Neurological Institute at Columbia Presbyterian Hospital in New York City. During her stay there, her vital signs were stable and normal. Although she did not respond to external stimuli, she did occasionally open her eyes and look around her room. No verbalization took place.

Mrs. Stich was returned to Riverview Hospital, where she currently remains, on March 8, 1977. As a result of intensive therapy, Mrs. Stich eventually became able to walk with substantial assistance, to feed herself occasionally, and to perform certain other activities of daily living. She remains seriously disoriented, however, and much of her speech is unintelligible. On October 14, 1981 a physical examination revealed that Mrs. Stich was spastic in all four extremities, and continued to exhibit bilateral Babinski reflexes. She could not follow objects or fingers with her eyes, suffered a mild left ptosis (drooping of the eyelid), and would attempt to put into her mouth any object coming into her visual field. In sum, Mrs. Stich's residual intellectual impairment is substantial.

### II.

On April 12, 1978, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1976), and the Swine Flu Act, 42 U.S.C. § 247b(k) (1976), Mr. and Mrs. Stich filed suit against the United States in the United States District Court for the District of New Jersey. Plaintiffs contended that

---

* Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation.

Mrs. Stich had contracted either GBS or some other condition as a result of her Swine Flu inoculation. The United States contended that Mrs. Stich's illness was not caused by the Swine Flu shot and that she suffered a viral encephalitis, probably HSE, unrelated to the flu vaccine.

Plaintiffs' action was transferred by the Judicial Panel on Multi-District Litigation to the United States District Court for the District of Columbia for co-ordinated and consolidated pre-trial proceedings pursuant to 28 U.S.C. § 1407 (1976). *See In Re Swine Flu Immunization Products Liability Litigation,* 89 F.R.D. 695 (D.D.C.). On February 5, 1980, plaintiffs' action was remanded to the New Jersey court for a trifurcated trial.[1] The final pre-trial order of the District of Columbia court provided that if plaintiffs established that Mrs. Stich had contracted GBS, liability would be conclusively presumed. If, however, a disease other than GBS were established, plaintiffs would need to prove negligence or some other appropriate theory of liability.

The trial court found that plaintiffs had failed to establish by a preponderance of the evidence that Mrs. Stich suffered from GBS or any other condition causally related to the Swine Flu inoculation. Rather, it concluded, Mrs. Stich suffered from HSE.

Plaintiffs appeal on a variety of grounds,[2] only one of which requires discussion. Plaintiffs argue that they were unfairly surprised when they received an article[3] only one week before its author, government expert Dr. Whitley, was scheduled to testify. Therefore, they argue, either Dr. Whitley should have been prevented from relying on the new article and the Government should have been prevented from using it at all, or plaintiffs should have been allowed to examine the article's underlying data so that they could effectively cross-examine Dr. Whitley.

■ In arguing that the trial judge abused his discretion in overruling their objections to the use of the article and in denying their request for leave to inspect the underlying date, plaintiffs have a heavy burden to bear. In general, the conduct of trial is left to the broad discretion of the trial judge, and the court of appeals will not retroactively substitute its judgment for that of the trial judge unless there has been an abuse of discretion. *See, e.g., Excel Handbag Co. v. Edison Brothers Stores, Inc.,* 630 F.2d 379, 388 (5th Cir. 1980); *Dobson v. Bacon Transport Co.,* 607 F.2d 805, 807 (8th Cir.1979); *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.,* 571 F.2d 1144, 1154–55 (10th Cir.), *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978). This general rule is particularly applicable to the matter of the admission or exclusion of expert evidence. *See, e.g., Seese v. Volkswagenwerk A.G.,* 648 F.2d 833, 844 (3d Cir.), *cert. denied,* 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981); *Fuentes v. Reilly,* 590 F.2d 509, 511 (3d Cir.1979).

■ Plaintiffs attempt to bolster their argument by claiming a right to the data under the rules of discovery. Plaintiffs' reliance on the rules of discovery does not help them, however, because the conduct of

1. It was contemplated that the diagnosis and causation of Mrs. Stich's condition would be determined in Phase I; Phase II would deal with foreseeability of risk and informed consent; and Phase III would determine damages. Phases II and III proved to be unnecessary in this case.

2. Plaintiffs argue that the trial court's findings that Mrs. Stich did not contract GBS or another neurologic condition causally related to the Swine Flu shot were clearly erroneous, that the trial court abused its discretion by permitting the government to present the testimony of certain expert witnesses and denying plaintiffs access to the data relied upon by those experts, by denying plaintiffs' request to depose certain consultants employed by the United States, and by failing to permit a doctor employed by the United States to testify for the plaintiffs. Finally, plaintiffs argue that the trial court's decision-making process was impaired because the United States improperly wrote to the court during deliberations. We have carefully considered all of these contentions, and have concluded that they are meritless.

3. Whitley, et al., "Herpes Simplex Encephalitis: Clinical Assessment," JAMA 247:317–320 (Jan. 15, 1982).

discovery is also committed to the sound discretion of the district court. *In re Fine Paper Antitrust Litigation*, 685 F.2d 810, 817 (3d Cir.1982), *cert. denied sub nom. Alaska v. Boise Cascade Corp.*, 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983). The substantial discretion granted to trial courts on discovery motions should not be lightly disturbed, *Imperial Ethiopian Government v. Baruch-Foster Corp.*, 535 F.2d 334, 337 n. 8 (5th Cir.1976), even if the reviewing court's notions of fairness would have led it to a different result. *Mendoza v. Tucson School District No. 1*, 623 F.2d 1338, 1347 (9th Cir.1980), *cert. denied sub nom. Sanchez v. Tucson Unified School District No. 1*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981).

To show an abuse of discretion under either theory, appellants must show that the trial court's action was " 'arbitrary, fanciful or clearly unreasonable.' " *Marine Petroleum Co. v. Champlin Petroleum Co.*, 641 F.2d 984, 991 (D.C.Cir.1979) (citation omitted). Otherwise stated, they must show that "no reasonable person could concur in the trial court's assessment of the issue under consideration." *Locascio v. Teletype Corp.*, 694 F.2d 497, 499 (7th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1876, 76 L.Ed.2d 808 (1983). Appellants have failed to make such a showing in this case.

■ The discovery request presented, as the trial court aptly termed it, "a close case." One can readily appreciate the plaintiffs' position when they were presented with a new—and potentially quite dam-aging—article one week before a government expert was scheduled to testify. On the other hand, there is no serious contention that the United States actually concealed the article; Dr. Whitley simply did not finish it until shortly before he was scheduled to testify. Furthermore, the plaintiffs' claim of surprise is attenuated by the fact that they had long been aware of several articles written by Dr. Whitley that relied on essentially the same data base,[4] but had not requested discovery of that data. Finally, the court's concern that granting plaintiffs' request would unduly delay the trial was hardly unreasonable. It was also a problem which plaintiffs did nothing to mitigate. Although plaintiffs had had the new article for a week before Dr. Whitley was scheduled to testify, they waited until Dr. Whitley was on the stand and testifying to make their discovery request. It is true that this trial was later adjourned and that affording plaintiffs access to the requested data might not actually have delayed the trial. Discovery rulings, however, cannot be judged by the standards of what hindsight has revealed. At the time the trial judge was making the decision, it was not an abuse of discretion to conclude that plaintiffs' need for discovery was not so great as to warrant yet another lengthy delay of the trial.[5]

■ Likewise, after concluding that plaintiffs could adequately prepare to cross-examine Dr. Whitley from already available data, it was not an abuse of discretion to allow Dr. Whitley to rely on the article in testifying. As this court pointed out in *Rovegno v. Geppert Brothers Inc.*,

---

4. Plaintiffs were aware at Dr. Whitley's April 1981 deposition of various Study Group articles on the issue of predicting the HSE diagnosis including: "Adenine Arabinoside Therapy of Biopsy-Proved HSE," N.E.J.Med. 297:289–294 (Aug. 1977); "HSE: Need for Accurate Diagnosis," MAMA 244:371–372 (July 25, 1980); "HSE: Vidarabine Therapy and Diagnostic Problems," N.E.J.Med. 304:313–318 (Feb. 5, 1981); and "Diagnosis and Treatment of Herpes Simplex Encephalitis," Ann.Rev.Med. 32:335–340 (1981).

5. The trial judge appeared to decide this motion under Rule 403 of the Federal Rules of Evidence. Clearly, this evidentiary rule had no bearing on plaintiffs' discovery request, and to the extent that the court and government counsel relied on it regarding plaintiffs' discovery motion, both were confused. We are not, however, persuaded that this confusion requires a different result. In this case, whether the court believed its balancing to be an exercise under Rule 403 or simply a part of making discovery decisions, the interests to be balanced were the same. Plaintiffs were not prejudiced by the district court's use of the wrong label. *Cf. Santos v. Immigration & Naturalization Service*, 375 F.2d 262, 264 (9th Cir.1967) (if sufficient reason for exercise of discretion exists, ill-advised reason may be disregarded as surplusage).

677 F.2d 327 (3d Cir.1982), particular deference is due to a trial judge's decisions weighing the relevancy of evidence against the possibility of unfair prejudice "because of [the trial judge's] superior position from which to assess the extent of potentially unfair prejudice. He, not the appellate judge, has the totality of evidence before him, [citation omitted] and must respond to evidentiary questions as they arise. Therefore, a reviewing court should be hesitant to substitute its own analysis based on a cold record." [6] *Id.* at 330.

On appeal, plaintiffs also argue that, under Rule 1006 of the Federal Rules of Evidence, they had an absolute right to discover the data underlying "Table 4" of the article. Therefore, they claim, the trial court erred in admitting Table 4 into evidence and in allowing Dr. Whitley to rely on it in his oral testimony without granting them access to the underlying data. While there is some force to this argument, we find that plaintiffs waived it by failing to raise it below in a specific and timely fashion.

Plaintiffs did not object at the time that Table 4 was received into evidence. Such an objection would not have been "futile," as plaintiffs contend. Although plaintiffs had previously argued their right to examine the data underlying Dr. Whitley's article, they never argued that they had a separate right to the data underlying Table 4. Indeed, they never requested the data underlying Table 4 separately from the data underlying the article as a whole. That difference is significant. Plaintiffs' objection to admitting Dr. Whitley's testimony without allowing them to examine the data upon which he relied was predicated on a balancing of prejudice and unfair surprise against materiality and delay in the litigation. Plaintiffs' present objection,

based on Rule 1006, invokes a purported absolute right to probe the bases for a "chart, summary or compilation." In the absence of any timely, specific objection, we cannot predicate any error on the admission into evidence of Table 4. Fed.R. Evid. 103(a)(1).

Because we conclude that the district court neither erred as a matter of law nor abused its discretion, we will affirm the judgment below.

---

**6.** In addition, we note that a fair reading of the district court's opinion suggests that the judge did not rely on Dr. Whitley's article or testimony in deciding that Mrs. Stich did not have GBS: he so decided because he concluded that she did not exhibit the symptoms necessary to a diagnosis of GBS. It appears that the judge relied on the contested article and testimony only in con-

cluding that Mrs. Stich had HSE—a conclusion unnecessary to the judge's decision that plaintiffs failed to carry their burden of proving that Mrs. Stich's illness was caused by the Swine Flu shot. Because we have concluded that the admission of this article was not an abuse of discretion, however, we need not rely upon this observation in deciding this case.