**Raymond JOHNSON,
Plaintiff, Appellee,**

v.

**H.K. WEBSTER, INC.,
Defendant, Appellant.**

No. 85–1096.

United States Court of Appeals,
First Circuit.

Argued June 6, 1985.

Decided Oct. 9, 1985.

Irvin D. Gordon, Concord, N.H., with whom James O. Barney and Sulloway Hollis & Soden, Concord, N.H., were on brief, for defendant, appellant.

W. Wright Danenbarger, Manchester, N.H., with whom Alan R. Kusinitz, Wiggin & Nourie, Manchester, N.H., John M. Shortill and Shortill & Shortill, Sanford, Maine, were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, and BREYER and DAVIS,* Circuit Judges.

DAVIS, Circuit Judge.

In this diversity tort case, defendant H.K. Webster, Inc. (Webster) appeals from a judgment entered on a jury verdict in favor of plaintiff Raymond Johnson (Johnson). The jury also found, in response to a special interrogatory, that the cause of the accident in which Johnson's foot was crushed in a grain conveyor designed by Webster was 51% Webster's negligent design of the machinery and 49% Johnson's negligent conduct in working near the device's exposed hazardous parts. The jury awarded Johnson $400,000 in damages under the applicable Maine comparative negligence statute.[1]

Webster contends that the trial judge committed several errors, including: admission of certain improper expert testimony by two of Johnson's witnesses, an erroneous charge to the jury on the issue of a manufacturer's duty to warn of known hazards, and refusal to request an explanation from the jury as to their calculation of damages (and, when this request was denied, refusal to grant Webster's motion for a new trial or, in the alternative, a remittitur).[2]

Webster points out that, under the applicable law, a shift in the jury's comparative negligence finding of one percent from Webster to Johnson (resulting in a 50–50 split) would have barred recovery. The conclusion appellant draws is that any error in such a case, even if small, could have resulted in a different verdict and is for that reason reversible.[3] We have therefore scanned the record with particular care but, having found no reversible error on the part of the trial court, we affirm.

## I. Background

In 1973, Webster designed an "under-track grain conveyor" for Cohen Milling Company (Cohen) in Saco, Maine. The conveyor serves to transport grains and meals from railroad hopper cars through an underground pipeline to storage silos located at the side of the track. Under Webster's design, a hopper car full of grain is positioned over a 14 inch by 48 inch trench underneath the track. Ideally, when the trap on the underside of the hopper car is

---

\* Of the Federal Circuit, sitting by designation.

1. The parties have stipulated that the law of Maine applies to this case. 14 Me.Rev.Stat.Ann. § 156 provides in pertinent part:

    Where any person suffers death or damage as a result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that death or damage shall not be defeated by reason of the fault of the person suffering the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the jury thinks just and equitable having regard to the claimant's share in the responsibility for the damage.

    \* \* \* \* \* \*

    If such claimant is found by the jury to be equally at fault, the claimant shall not recover.

2. There is no challenge as to the sufficiency of the evidence of liability in itself.

3. *See Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946) (to determine whether error is reversible, an appellate court should consider "the character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to casting the balance for decision on the case as a whole"); *cf.* Fed.R.Civ.P. 61 (harmless error rule).

released, the grain flows down into the trench. In the trench is an auger, a screw-like device which pushes the grain through a pipeline into the storage bins.[4]

Webster's design of the conveyor included a removable metal grate which fits over the undertrack trench. The spaces in the grate were about five inches square, sufficiently small to keep an adult's feet out of the trench, but large enough to allow most grains to pass through smoothly. But in the early 1970's (and to a certain extent, still today), the grain mills faced a problem of lumping. Certain products such as soybean meal would coagulate into large balls, often a foot in diameter. The spaces in a grate over the undertrack trench designed to keep feet out were too small to allow lumped materials to pass through. Webster's design therefore specifically called for a removable grate to allow lumped materials to pass to the auger unimpeded.

Appellee Johnson worked for Cohen in its milling operation. On September 16, 1980, Johnson emptied a hopper car of corn (a non-lumping grain) into the conveyor. He then moved the car down the track and began to sweep the corn lying at the sides of the trench. As was the habit at Cohen, the grate was not covering the trench into the conveyor. Believing he was to the side of the trench, but actually standing in front of it, Johnson stepped back into the conveyor. The auger gripped and crushed his right foot. After a series of surgical efforts to save the foot, doctors were forced to amputate Johnson's right leg below the knee.

Johnson filed suit against Webster in 1982 alleging negligent design of the conveyor, breach of warranty and strict liability in tort. After extensive discovery, the case came up for trial in 1984. At the start of the trial, Johnson dropped the breach of warranty counts.

A major procedural issue at trial, now raised before us, was the admissibility of testimony offered by two of Johnson's witnesses, Robert Flynn and Igor Paul. In each instance, Webster contended that the opinions advanced by the witnesses were not properly disclosed to defendant in response to pretrial interrogatories. The trial court limited Flynn's testimony to matters raised at his deposition and admitted all of Paul's testimony.

At trial, Johnson proved approximately $422,000 in monetary losses from the accident, including $53,000 in medical expenses, $69,000 in lost earnings up to trial, and $300,000 in lost future earnings. After receiving unchallenged instructions from the trial judge, the jury returned a verdict in Webster's favor on the product liability count and in Johnson's favor on the negligence count. As already noted, the jury awarded damages in the amount of $400,000 and found fault of 51% on Webster's part, 49% on Johnson's.

After the jury announced its verdict, counsel for Webster requested that the trial judge have the jury specifically confirm that the amount of damages which the jury set down in response to the jury interrogatory was actually the total amount of damages the jury found less the set-off for the degree of Johnson's fault as required by Maine law. The trial judge refused to pose that post-verdict inquiry. After trial, Webster filed a motion for a new trial or, in the alternative for remittitur, contending that Johnson had proved only $400,000 of damages *in toto* and that the jury should have awarded only 51% of this amount. Webster also noted the unlikelihood that the jury, after subtracting 49% of its total damage assessment, would end up with an even figure like $400,000. The trial judge denied the motion. Webster filed a timely appeal raising all the issues we have mentioned.

## II. *Testimony of Robert Flynn*

Robert Flynn was Cohen's safety engineering consultant at the time of Johnson's accident. The duty thus fell on Flynn to

---

**4.** In the record, the auger in the Webster grain conveyor is likened to the inner mechanism of a meat grinder, which grips meat inserted in the top of the grinder and presses it against the grinding blades.

investigate and report on the incident. In his report, he noted that Johnson had failed to replace the safety grate over the trench before sweeping the area. Prior to trial, Webster took Flynn's deposition and questioned him about his post-accident investigation. At this time Johnson had not indicated that he would rely on Flynn for expert testimony. Johnson had, however, placed Flynn on a general witness list.

During pretrial discovery in 1982 and 1983, the trial court issued several orders requiring the parties to identify expert witnesses they expected to call at trial. The two sides took depositions of these experts at the end of 1983. At a pretrial conference on July 10, 1984, the court directed the parties to enter any objections to the other sides' witnesses by September 6. On September 17, seven days before the trial was scheduled to begin, Johnson sought to amend its list of experts by adding Flynn as an expert. Webster objected, noting that it had deposed Flynn only as a "fact" witness with regard to his observations and impressions as safety engineer for Cohen, and not as to his expert opinions regarding the cause of Johnson's accident or safety engineering generally. The trial court allowed Flynn to testify as an expert witness, but limited the scope of Flynn's testimony to matters previously raised at his deposition. Prior to Johnson's direct examination of Flynn, the trial judge stated: "In the event [Johnson's counsel] attempts to elicit information from [Flynn] that's not therein contained [*i.e.*, not in his deposition testimony], the motion to strike will be received with favor."

Webster proffers two arguments with regard to the trial judge's treatment of Flynn's testimony. First, appellant urges that the trial court erred in allowing Johnson to call Flynn as an expert witness entitled to testify as to his opinions, when he had previously been listed and deposed as a "fact" witness entitled to relate only his first-hand observations and impressions. Webster points out that Johnson did

not list Flynn as a possible expert witness until one week before trial. Under Fed.R. Civ.P. 26(b)(4)(A)[5] and the district court's pretrial orders, the argument runs, Johnson should have listed Flynn as an expert during discovery, set forth a synopsis of Flynn's expected testimony, and afforded Webster the opportunity to take Flynn's deposition. Without that background information, Webster's counsel says that he was surprised by Flynn's testimony and placed in a poor position to cross-examine him.

To respond to this argument with respect to Flynn's direct examination calls upon us simply to restate what actually occurred: the trial judge limited Flynn's testimony to matters which had been raised at his deposition. This negated any possible prejudice from Flynn's being able to testify at the trial as to any new matter. In fact, at one point Webster's counsel (Mr. Gordon) objected to a question posed by Johnson's attorney (Mr. Danenbarger). The following colloquy ensued:

MR. GORDON: At the outset of this trial we objected to this witness offering any expert testimony on the grounds that there had not been adequate disclosure. Your Honor ruled at that time, if I recall, that his testimony on any expert questions were to be limited to subject matters in that area that had been taken up [*sic*, at] his disposition [sic]. He is now being asked about an incident [that], to my best recollection, was not treated in that deposition.

THE COURT: Well, if it isn't, then I'll sustain it.

MR. DANENBARGER: Well, I—

MR. GORDON: I may stand corrected. We're talking about 125 pages of transcript. But my distinct recollection, Your Honor, is that this is not a matter covered in that deposition.

MR. DANENBARGER: Your Honor, I'd ask Mr. Gordon to turn to—(examining deposition)—page 88 and 89 of the transcript of Mr. Flynn's deposition.

**5.** Rule 26(b)(4)(A) provides that a party may obtain a list of the opposing party's expert witnesses, the subject matter of their testimony, and the substance of their opinions.

(Brief pause; Mr. Gordon reviewing deposition.)

MR. GORDON: Your Honor, having in mind my prior objection to his expertise, which I will have to stand on, we will withdraw the objection to the question on the ground it was not asked.

THE COURT: All right.

MR. GORDON: Thank you.

The court thus expressed and demonstrated its willingness to entertain any objection by Webster that the scope of the direct testimony was beyond the subjects covered at the deposition, and thus avoided any source of surprise and prejudice to Webster. We have found no instance in the record in which the trial judge overruled an objection by Webster on this ground.

■ On cross-examination, the trial judge did limit Webster's questions to matters raised at the deposition, matters which it had already had a chance to explore once and should have been prepared to confront at trial. Nevertheless, Webster says that it was not properly prepared because (at his deposition) Flynn had on direct examination expressed opinions on issues involved in the case which it had not then explored because Flynn was not then expected to testify as an expert. Moreover, Webster argues that its cross-examination of Flynn as an expert should not have been restricted to his deposition expert testimony. Without deciding whether or not it was error for the judge so to curtail Webster's cross-examination of Flynn, we believe that, if any such error occurred, it was harmless in the circumstances here.[6] Despite the trial court's limitation, Webster's counsel was able to elicit from Flynn extensive testimony, both factual and ex-

pert, about Johnson's culpable role in the accident (by not using the grate) and the possibility of an accident even if other safety devices had been present. Flynn expressly testified and reiterated, for instance, that a piece of equipment could become more hazardous by the addition of some "safety devices." He also testified as to the by-passing of safety devices by workmen. Finally, he said that he had never seen or heard of an "undertrack grain conveyor of this type which was electrically interlocked with a grate over the undertrack conveyor." We think, in sum, that it was highly improbable that, if Flynn had been allowed to answer the few specific questions to which Johnson's counsel successfully objected on cross-examination (because they had not been raised at the deposition), any further substantial benefit to Webster's case would have ensued.

### III. *Testimony of Igor Paul*

At the time of the trial, Professor Igor Paul was on the faculty of the Massachusetts Institute of Technology in the Department of Mechanical Engineering. Soon after the accident, Johnson engaged Paul to examine the conveyor and its safety features. In May 1983, Paul issued an opinion regarding the safety features, which reads in pertinent part:

In my professional opinion the design of the underground auger conveyor designed and installed by [Webster] ... was improper, inadequate and defective in failing to provide effective permanent or safety-interlocked removable grate guarding for the intake area of the conveyor trough.... The large opening above the auger screw in this design

---

**6.** Chief Judge Campbell and Judge Breyer believe that, to the extent that the district judge's rulings were meant to limit Webster's cross-examination to the same questions Webster posed during the deposition, this was error. While Johnson's direct examination could properly be restricted to Flynn's deposition testimony to prevent the introduction of any surprise opinion evidence, this was no basis, in the majority's view, for restricting Webster's cross-examination in the same manner. Webster's failure to ask certain questions of Flynn during the depo-

sition did not effect a waiver of its right to ask those questions at trial; indeed, tactical decisions of this nature are often the very essence of a party's trial strategy. Of course, Webster's cross-examination of Flynn could have been properly limited to the subject matter covered in Flynn's direct under Fed.R.Evid. 611(b), but it is not clear that this is what the district judge had in mind. In any case, all the members of the panel are unanimous in believing that any error in this respect was harmless.

should have been provided with a grate guard safety interlocked to two hermetically sealed power interrupt switches in a self-testing interlock circuit which would stop auger motion whenever the guard was removed for any reason ... and would not allow powered auger motion until the guard was replaced.

As Paul would later testify, the system he described would render the conveyor non-functional when the grate was removed. The self-testing interlock circuit would insure that, if the system failed, it would fail on the side of safety and the system would shut down completely.

Soon after he received the opinion, Johnson notified Webster that Paul would testify that the conveyor was unsafe "because it could be operated while the safety grate was not in place ... [and] regarding various safety devices which should have been included as part of the grain auger." Webster took Paul's deposition in September 1983 and questioned him extensively about his inspection of the conveyor site and his opinion regarding its safety. During his deposition, Paul indicated that his inspection of the conveyor was not complete. Just before trial, Johnson confirmed in a submission to the trial court that "there is no need to anticipate any testimony different [from] that given at his [Paul's] deposition."

Subsequent to his deposition, Paul became aware of the lumping problem associated with certain grains. This made his grate interlock system impossible to use since Cohen would have to remove the grate to feed the lumped material into the conveyor. Under Paul's theory, the power would then shut off and the conveyor would be useless. For operation with lumping grains, the conveyor would have to operate without the grate in place.

At trial, Paul testified as to other specific methods of guarding the conveyor trench. He pointed out that "if you just cannot feed material through a safety grate, then you have to provide alternate ways of guarding." He listed several possible devices which could be used on Cohen's con-veyor, including: a split grate which could open but which would still provide a type of fence around the trench; a plain fence around the trench; and, "if you had to go to that extreme ... an interlock side grating so that you could only operate the auger if the grate were removed, if there was a railroad car in place." This last device would have prevented the conveyor from operating when the grate was not in place unless a railroad car was stationed over the trench.

Webster asserts that this testimony should have been excluded because Johnson never disclosed prior to trial that Paul had formulated possible safety procedures (besides the type of grate interlock he specifically mentioned at his deposition) for use at the Cohen conveyor. Webster relies on Fed.R.Civ.P. 26(e) which states:

*Supplementation of Responses:* A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(1) A party is under a duty reasonably to supplement his response with respect to any request addressed to ... (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

In appellant's view, Johnson had a duty to inform it of Paul's alternate ideas regarding possible safety devices for the Cohen conveyor.

The 1970 Amendments to the Federal Rules of Civil Procedure added several new provisions on pretrial discovery of expert witnesses, including Rules 26(b)(4) and 26(e), *supra.* The court in *Smith v. Ford Motor Co.,* 626 F.2d 784, 791–93 (10th Cir. 1980), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981), has provided a detailed description of the origins and purposes of the new treatment of expert discovery in the Federal Rules. Briefly, the ill which the amendments sought to cure

was the heavy burden placed on a cross-examiner confronted by an opponent's expert whose testimony had just been revealed for the first time in open court. As the Advisory Committee Note to Rule 26(b)(4) states, this situation "produces in acute form the very evils that discovery has been created to prevent. Effective cross-examination of an expert witness requires advance preparation." The Advisory Committee thus proposed Amendments to Rule 26 on the ground that, under the old prohibition against discovery of expert witnesses, "the narrowing of issues and elimination of surprise which discovery normally produces are frustrated." In order to enforce the Rule, the Advisory Committee Note to Rule 26(e) calls for "sanctions imposed by the trial court, including exclusion of evidence, continuance, or other actions as the court may deem appropriate."

■ Rule 26(e)'s supplementation requirement is not absolute. As the rule itself makes clear, the instances in which a party must supplement discovery are limited; if the rule called for supplementation in all instances, the actual trial would be merely a recital of earlier responses to written interrogatories and deposition questions. For instance, nothing in the rule or the Advisory Committee Note forecloses an expert from revising or further clarifying opinions during redirect examination or surrebuttal in response to points raised by the opposing party during its cross-examination or the presentation of its case. We must therefore not read Rule 26 mechanically, but rather in light of its dual purposes, "narrowing of issues and elimination of surprise." [7]

The cases which have considered objections to proffered testimony because it was not earlier disclosed have reflected this need to balance fairness to the opposing party with the realities of adversarial litigation. For example, in *Smith v. Ford Motor Co., supra,* the court reversed a judgment because the trial judge improperly admitted testimony from a medical expert relating to the connection between plaintiff's injuries and an alleged defect in plaintiff's automobile. Plaintiff had stated that the expert would testify only as to plaintiff's injuries. The appellate court noted that plaintiff had "misled Ford into believing that his testimony would relate solely to plaintiff's injuries and not to their relationship to a defective seat belt." 626 F.2d at 797. Similarly in *Holiday Inns, Inc. v. Robertshaw Controls Co.,* 560 F.2d 856 (7th Cir.1977), the court held that testimony regarding plaintiff's alternate theory as to the origins of a fire in a hotel kitchen should be excluded. Plaintiff alleged during pretrial discovery that a control thermostat in a deep fat frier malfunctioned. Defendant in an interrogatory asked specifically if plaintiff alleged any other causes. Plaintiff responded in the negative. The court ruled that plaintiff could not then present evidence at trial that the frier lacked an oil level sensing device because "that resulted in defendant's being surprised at trial by plaintiff's alternative theory." 560 F.2d at 858.

On the other hand, in *Stich v. United States,* 730 F.2d 115 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984), the Third Circuit approved a district court's ruling allowing medical testimony based on research published only a few weeks before trial. The appellate court noted that "plaintiffs could adequately prepare to cross-examine [the witness] from already available data." *Id.* at 118. In *Murphy v. Magnolia Elec. Power Ass'n.,* 639 F.2d 232, 234, 235 (5th Cir. 1981), the court held that plaintiff's expert should have been allowed to testify as a

---

7. The parties have called to our attention the four-part test enunciated by the Third Circuit in *Meyers v. Pennypack Woods Home Ownership Ass'n.,* 559 F.2d 894, 904–05 (3d Cir.1977). That case differs because it concerned a witness who had never been put on a witness list. That type of case does not involve the precise problems which arise when, as here, a witness is expected but the particular testimony may not be. We agree with the Third Circuit that the two most important factors to be considered are the prejudice and surprise suffered by the opposing party, and that party's ability to cure the prejudice.

rebuttal witness "despite the fact that appellants breached their duty under Fed.R. Civ.P. 26(e)," given "the absence of prejudice and the essential nature of the evidence involved."

■ As these cases demonstrate, the emphasis in evaluating the decision to admit testimony over a Rule 26(e) objection entails careful balancing. Trial and appellate courts should look to the conduct of the trial, the importance of the evidence to its proponent, and the ability of the defendant to formulate a response. *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1201–02 (3d Cir.1978). It is noteworthy that, in those cases in which testimony was held properly excluded, the courts have found some evasion or concealment, intentional or not, on the part of the litigant offering the evidence.

Closely linked to the issue of surprise and prejudice—its converse side—is the question of whether the party objecting to the evidence might have been able to confront the evidence with a minimum of disruption to the trial. Courts have often found it significant whether the objecting party sought a continuance to prepare to rebut the testimony. The Advisory Committee Note to Rule 26(e) expressly states that one possible sanction for a party's failure to provide supplemental responses is the granting of a continuance; here, Webster asked the trial judge for the far more drastic remedy of excluding the testimony in issue. Courts have looked with disfavor upon parties who claim surprise and prejudice but who do not ask for a recess so they may attempt to counter the opponent's testimony. *Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342, 344 (8th Cir.1979); *see also, Dychalo v. Copperloy Corp.*, 78 F.R.D. 146, 148 (E.D.Pa.) *aff'd without op.*, 588 F.2d 820 (3d Cir. 1978) ("Even if we are incorrect in finding constructive compliance with 26(e)(1) in light of other notices, the appropriateness of plaintiff's proposed cure at trial—the exclusion of all Mr. Sargent's testimony—does not logically follow"); *cf. Stich, supra,* 730 F.2d at 118 (noting that plaintiff who claimed surprise by physician's use of recently completed report presented "a problem which plaintiffs did nothing to mitigate").

■ Although the issue of the exclusion of Paul's testimony because of Johnson's presumed duty to supplement his original response regarding that presumed testimony does present a close question, we do not conclude that Webster has demonstrated an abuse of the trial judge's discretion to control discovery and the admission of evidence. *See* Part II, *supra.* Johnson had clearly indicated that Paul would discuss safety devices using interlock circuitry (though a different type of such circuitry), and Paul never departed from that general scheme. Webster says that this case is identical to *Holiday Inns, supra,* because Paul's testimony at trial related to an apparatus different from the device discussed in detail at his deposition, but it is clear that, unlike the plaintiff in *Holiday Inns,* Johnson responded correctly to the interrogatory and adequately informed Webster of the general technology on which it would, and in fact did, rely.[8] *See DeMarines v. KLM Royal Dutch Airline,* 580 F.2d at 1201–02 (in which the court ruled that defendant's expert's testimony regarding the particulars of plaintiff's exact physical condition prior to an accident should be admitted when defendant had stated generally that it would raise plaintiff's pre-existing illness as an element of the case).

Moreover, Webster presented the judge solely with a motion to exclude the testimony, the most drastic remedy. Webster never asked for a trial continuance so it could

---

**8.** Five days before Paul testified, Johnson had expressly asked Mr. Ralph Webster (a leading officer of appellant) about interlocks keyed "to the presence of the train or the placement of the grate," and Mr. Webster had replied, "I think it's a concept that is worth consideration" and that he would "have to know more about that." It

prepare to respond.[9] One excuse given us is that the trial judge never recognized any prejudice to Webster, so he would not have granted a continuance. However, the trial judge did not say that he saw no prejudice to Webster. He ruled merely that in this situation he saw no reason to grant a motion to strike.

Nor is it a proper excuse that Webster could not retain an expert knowledgeable in the proposed circuitry (*i.e.,* an interlock circuit between the grate and the railroad cars) in time to counter Paul's testimony. As shown in footnote 8, *supra,* Webster already knew (at least five days before) that the subject was on plaintiff's mind. But Webster never retained an expert on interlock circuitry at all. Its experts were familiar with the designs of grain mills and conveyors. The intention was simply to rebut Paul's original opinion regarding the interlocked grate with testimony on how that solution would be impossible given the lumping problem. In his testimony, Paul surmounted that difficulty by applying the same technology in a different way. Webster was then prepared only to rebut a particularly narrow point as to interlock circuitry, but that point never materialized. We cannot say, because Webster's original trial strategy approached the interlock issue so narrowly and it did not properly seek to cure its limited preparation when the new techniques surfaced, that the trial judge was in error. *See Phil Crowley Steel Corp., supra,* 601 F.2d at 344 (in which the court ruled that undisclosed expert testimony correctly stating plaintiff's damages should not be struck merely because the other party was prepared at trial only to rebut the previously disclosed incorrect testimony).

seems fair to say that the concept was not entirely strange or bizarre to Mr. Webster.

9. As indicated in footnote 8, *supra,* that matter had been mentioned at the trial some five days before Paul brought it up.

10. Webster concedes that, since the issue of warnings was raised as to both counts, the jury's

## IV. *Jury Instruction on the Duty to Warn*

Johnson contended at trial that Webster failed to provide warnings to those who used the conveyor that it could be dangerous when operated without the grate. The failure to warn became an element of Johnson's case on the strict liability count and also the negligence count.[10] Webster now argues that the trial court erred in failing to instruct the jury that the duty to warn "refers to latent dangers in the normal and intended use of the product and there is no such duty unless the danger is concealed or less than obvious."

The law of Maine on the duty of a manufacturer to warn of the dangers involved when using its product comes directly from the Restatement (Second) of Torts § 388 (1965). *Cuthbertson v. Clark Equipment Co.,* 448 A.2d 315 (Me.1982). That section provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

verdict in Webster's favor on the strict liability count may well indicate that the jury's verdict on the negligence count was not based on Webster's failure to provide warnings. However, strict liability and negligence have distinct and different elements. We are therefore reluctant to guess what the jury intended, and address the issue.

In his instructions, the trial judge recited § 388 practically verbatim.[11]

An appellate court reviews a trial court's jury instructions only to insure that "the charge fairly and accurately states the law." *Johnson v. A/S Ivanans Rederi,* 613 F.2d 334, 350 (1st Cir.1980), *cert. dismissed,* 449 U.S. 1135, 101 S.Ct. 959, 67 L.Ed.2d 325 (1981). Our task is to scrutinize not the style but the substance. In this instance, section 388(b), *supra,* indisputably covers the very point defendant wished to make. *See* comment k thereto. Obviously, the trial judge did not err in reading it to the jury word for word, instead of modifying the accepted Restatement language at the behest of one of the parties.

### V. *The Damage Award*

Webster's final assignment of error concerns the propriety of a $400,000 damage award in the context of this case. This challenge has two facets: first, that the district court should have asked the jury after it announced its verdict (as Webster sought) expressly to confirm that it had correctly applied Maine's comparative negligence statute as to the award; and, second, that under that statute the evidence would not sustain a verdict for plaintiff of as much as $400,000.

There is, first of all, no attack on the trial court's correct, very explicit and detailed charge as to how that jury was to calculate the award under the Maine statute. The jury was indisputably directed to reduce the total damages by Johnson's negligence, if any. In addition, question No. 7 (to the jury) was equally express in stating that any recovery by Johnson was "to be reduced by the percentage to which his comparative negligence causally contributed to the accident." There can, in short, be no reversal on the ground that the jury was in any way uninformed or inadequately instructed—or that simply because of the amount of the award the court had to reconfirm its instructions after the verdict.

Is there, however, any good reason to think the jury did not follow its instructions or went beyond its proper province? Webster points to the unlikelihood that the jury calculated damages in the amount of $784,-312.72, 51% of which equals precisely $400,-000.[12] We are told that the evenness of the damage award is persuasive evidence that the jury intended to award only $204,000, or 51% of the total $400,000. Webster also notes that Johnson proved specific losses of only $422,000, which is close to the $400,-000 total the jury awarded. In considering these arguments, we must grapple with two problems: whether the evenness of the award is any true indication of jury error, and whether the record supports a total award of nearly $800,000.

Webster seeks mathematical precision in an area where imprecise calculations, gross approximations, and rough projections are the most one can normally expect. A tort award ordinarily covers various types of compensation to which a tort victim is entitled. Many of these elements of monetary damages—*e.g.,* future earnings—are themselves only educated guesses hardly likely, if precision is demanded, to result in an even figure given the complexity of present value calculations and the odd figures normally associated with interest and inflation rates, as well as lifespans. Other elements (*e.g.,* pain and suffering) are not readily

---

**11.** The trial judge substituted "machinery" for "chattel" and deleted the phrase "with the consent of the other."

**12.** This argument is predicated on the assumption that the jury was required to lower the total award by precisely the percentage of Johnson's culpability. This is not an obvious assumption, especially since the Maine comparative negligence statute provides only for a reduction "to the extent deemed just and equitable, having regard to the claimant's share in the responsibility for the damages." 14 Me.Rev.Stat.Ann. § 156. Insofar as the Maine courts have spoken to the point, they indicate that the jury need not be precise: "Once defendant's liability is established it is solely the fact-finder's prerogative to reduce the amount of damages recoverable within the statutory concept." *Jackson v. Frederick's Motor Inn,* 418 A.2d 168, 174 (Me.1980).

measurable. Thus our system of justice often grants the jury leeway to deal in whole numbers and even amounts where more exact computations are too impractical or difficult. The fact that here the jury ended with an even number is not in itself cause for reversal, or even surprise—and rather seems to be expected under the applicable Maine statute, which permits the jury to reduce the total figure by dollars and cents "to the extent deemed just and equitable, having regard to the claimant's share in the responsibility for the damages." 14 Me.Rev.Stat.Ann. § 156. *See also* footnote 12, *supra.*

Nor does the closeness of the $400,000 verdict to the $422,000 in specific pecuniary losses suffered by plaintiff show that the award was the product of jury error. A total of gross damages of nearly $800,000 in this case would not be viewed as excessive. In Maine, the proof of monetary loss is only the beginning of the damages calculation. Pain, suffering and permanent impairment are all compensable. *Kaler v. Webster,* 348 A.2d 702, 705 (Me.1975); *Isaacson v. Husson College,* 332 A.2d 757, 763 (Me.1975). Maine's Supreme Judicial Court has stated that a "marked disparity between actual expenses incurred and the total damages awarded will only rarely, if ever, provide a *per se* basis for holding damages excessive." *Jamshidi v. Bowden,* 366 A.2d 522, 524 (Me.1976). In *Kaler, supra,* for example, plaintiff incurred $1,153 in expenses and $1,700 in lost wages because of an accident in which he suffered a 30% loss of the use of his ankle; the court ruled that a $60,000 verdict in plaintiff's favor should not be overturned.

Although the parties have not cited, and we have not found, any Maine case similar to this, several other federal appellate courts have reviewed damage awards in cases stemming from similar accidents. In one such case, *De Santis v. Parker Feeders, Inc.,* 547 F.2d 357 (7th Cir.1976), the Seventh Circuit affirmed a trial court's decision not to disturb an $840,000 award to a boy who lost his left leg below the knee in the auger of his father's cattle feeder. The award included $300,000 for pain and suffering up to trial and $500,000 for future damages. With regard to the latter award, the court noted that "[t]he boy has lost his leg, and there will not be a day in his life when he will not have to cope with that." *Id.* at 366.

▇ In light of Johnson's injuries, we cannot agree with Webster that the $400,000 verdict was probably the gross jury award, or that a gross total of about $800,000 could not be upheld. We need not describe the series of surgical procedures by which doctors initially attempted to save Johnson's leg. Moreover, subsequent to the initial amputation, Johnson underwent two further "stump revisions," or additional amputations. He has also undergone three nerve block procedures, but still suffers from phantom pain and neuromas.[13] Given the very full deference which Maine courts grant to the jury's damage award, we cannot say that an $800,000 verdict would, in light of Johnson's monetary losses and continued physical and mental suffering, be excessive.

For these reasons, the judgment of the district court entered on the jury's verdict is

*Affirmed.*

---

13. Phantom pain is the disturbing feeling suffered by many amputees that they still have their lost limb. Neuromas are small, very painful nerve tumors.