Luis Enrique DE LA CRUZ and Olga Torres on their own behalf and on behalf of their conjugal partnership and on behalf of their minor children Luis Enrique De La Cruz Torres, Raul De La Cruz Torres and Barbara De La Cruz Torres, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 86–0587 (JP).

United States District Court, D. Puerto Rico.

March 23, 1987.

Howard Charles, Ortiz Toro & Ortiz Brunet, Hato Rey, P.R., for plaintiffs.

Asst. U.S. Atty. Osvaldo Carlo Linares, U.S. Atty's Office, Chardón Ave., Hato Rey, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

This is a medical malpractice action brought under the Federal Tort Claims Act, 28 U.S.C. Section 2671, *et seq.* The Court has jurisdiction under 28 U.S.C. § 1346(b). The plaintiffs allege that as a result of employees of a Veterans Administration Hospital providing inadequate care to plaintiff Luis Enrique de la Cruz, De La Cruz fell and fractured his left shoulder. Plaintiffs allege physical and emotional suffering and mental anguish.

The case was tried without a jury, where both parties presented witnesses and documentary evidence. Upon conclusion of the

trial, the parties submitted the case to the Court for adjudication. Based upon the evidence, and after due deliberation, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Luis Enrique de la Cruz is a 43 year-old veteran married to Olga Torres and has three minor children.

2. The plaintiff was inducted into the U.S. Army on October 5, 1964, and he remained for two months in Puerto Rico for training. He was considered "the best trainee of the month" and was given honors for this. He was sent to Fort Bragg, North Carolina, and later to Santo Domingo, Dominican Republic. (Joint Exhibit IV).

3. On January 12, 1966, while he was stationed in Santo Domingo, De La Cruz shot himself in the left side of the chest with an M–14 rifle. He was admitted to the 15th Field Hospital that same day. He was later transferred to Womack Army Hospital, and then to Walter Reed Hospital until his transfer to Hato Rey Psychiatric Hospital on November 22, 1966. (Joint Exhibit IV).

4. Plaintiff was discharged from the Army in 1967 and was granted one hundred percent (100%) service-connected disability due to schizophrenic reaction, paranoid type, of a chronic, severe nature. Further medical examinations revealed that plaintiff had symptoms of serious psychiatric disorders since he was a young boy. (Joint Exhibit IV). De La Cruz does not work, and receives a Veterans Administration pension and social security benefits.

5. De La Cruz has received psychiatric treatment since 1966 from the Veterans Administration. Since 1982, Dr. Manuel Colón Vargas has treated De La Cruz's psychiatric condition, and fees are paid by the Veterans Administration. Dr. Colón Vargas Vargas has also treated other members of the De La Cruz's family who are plaintiffs herein.

6. Prior to January 16, 1984, De La Cruz drank alcohol heavily. He had threatened to kill his family and himself. He would sometimes sleep on the porch with a revolver, and at times heard voices telling him to kill himself and strangle his wife. In addition, plaintiff was suffering from hallucinations.

7. On January 11, 1984, Dr. Colón Vargas examined De La Cruz and recommended that he be hospitalized due to the deterioration of his mental illness. Dr. Colón Vargas recommended that he be hospitalized for at least two weeks, for his welfare and for the welfare of his family. However, no attempts were made to hospitalize De La Cruz until January 16, 1984.

8. On January 16, 1984, plaintiff Olga Torres drove her husband from Coamo to San Juan to hospitalize De La Cruz at the Veterans Administration Hospital (VA Hospital). At or around 2:45 p.m., De La Cruz was examined by psychiatrist Ismael Carlo at the VA Hospital. Dr. Carlo found plaintiff, alert, incoherent, and with a heavy alcohol breath. (Joint Exhibit II). In addition, Dr. Carlo found that De La Cruz had an affective disorder and a substance use disorder. (Joint Exhibit II).

9. On plaintiff's arrival, there were no beds available in the Psychiatric Intensive Care Unit of the VA Hospital. Plaintiffs remained in the hospital and waited for a bed to become available. At around 4:30 p.m., plaintiffs were informed that no beds were available; however, Dr. Carlo suggested hospitalization at a Veterans Administration contract hospital. Plaintiffs rejected this suggestion and left the VA Hospital. (Joint Exhibit II).

10. After leaving the VA Hospital, plaintiffs went to see Dr. Colón Vargas. Upon arriving at his office, the doctor was unable to examine De La Cruz because he was attending other patients. Plaintiffs informed Dr. Colón Vargas that they had been waiting at the VA Hospital for a bed to become available. Dr. Colón Vargas gave De La Cruz two libriums because plaintiff was upset, anxious, and angry because he had not been admitted to the hospital, and asked plaintiffs to go to his home where he could examine De La Cruz later that same day.

11. Plaintiffs arrived at his home, where they were greeted by the doctor's wife, Nilda Colón. While waiting at Dr. Colón's home, Olga Torres told Nilda Colón that De La Cruz was getting worse. Mrs. Colón immediately called her husband and informed him that Mr. De La Cruz was complaining that he felt bad, was pale and was getting worse. Dr. Colón Vargas asked his wife to tell plaintiff Olga Torres that she should take her husband to the VA Hospital. Plaintiffs then left his home.

12. Plaintiffs arrived at the VA Hospital at around 7:30 p.m. De La Cruz and his wife walked unattended to the emergency room, and Mrs. Olga Torres did not request the help of any medical personnel to bring her husband into the emergency room. Once they arrived at the reception area, plaintiff asked to see a doctor.

13. Medical personnel who work in the emergency room of the VA Hospital are aware of and perform the standard admitting procedures. The patient completes Form 10–10M, the admittance form, with the assistance of the receptionist. If the patient states he needs immediate medical care, the receptionist calls the doctors and nurses and the patient is called into the emergency room. The doctor evaluates the patient, who determines whether the patient should receive immediate medical attention. If the doctor determines there is no emergency, the patient is then returned to the reception area where he is to wait for his turn. The medical personnel at the hospital conducted themselves according to the procedures on that day and evening.

14. Nurses and doctors who work in the emergency room escort patients from the reception area to the emergency room. They are required to bring the patient inside the emergency room in the same manner as the patient enters the reception area. That is, if a patient is in the reception area in a wheelchair, he is to be brought inside the emergency room in a wheelchair. Wheelchairs are available, and to obtain one, the patient or the person who accompanies the patient need only ask for one. There are more wheelchairs available during the night than during the day. The

emergency room of the VA Hospital consists of two (2) stretchers for patients of heart attacks or who are bleeding, three (3) wheelchairs, five (5) stretchers for observation, and one (1) stretcher for surgeons. Approximately seven (7) to nine (9) patients can be attended at the same time. There are no cubicles, but an open space divided by curtains.

15. Plaintiffs did not ask for a wheelchair at any time on January 16, 1984. After requesting that De La Cruz be seen by a doctor, plaintiffs waited for their turn. De La Cruz spoke to others who waited for medical attention before he was called.

16. At around 9:00 p.m., De La Cruz was called by a male nurse. De La Cruz was accompanied by his wife to the door of the hallway leading to the emergency room. From there, he was escorted by the nurse to the emergency room. De La Cruz walked inside the emergency room unattended and sat on a chair near the desk of Dr. Dilia Díaz.

17. While De La Cruz was sitting inside the emergency room, he informed Dr. Díaz that he had pain in the left shoulder and that he had suffered a seizure. De La Cruz was holding his left arm while he spoke to Dr. Díaz. At no time did De La Cruz inform Dr. Díaz that he was feeling dizzy while Dr. Díaz gathered De La Cruz's medical complaints.

18. While Dr. Díaz was speaking to the plaintiff, he saw De La Cruz slip from the chair to the floor. With the help of a nurse, Dr. Díaz got the plaintiff onto a stretcher. A tongue depressor was applied to the plaintiff and several tests, including an EKG, vital signs, blood, sugar and electrolyte, were performed in order to determine the cause of the seizure.

19. Thereafter, several X-rays were performed on De La Cruz. The X-rays revealed that plaintiff had a dislocation of the left shoulder associated with a fracture of the greater tuberosity of the left humerus. When it was known that De La Cruz had a fracture, Dr. Díaz went to the reception area and questioned plaintiff Olga Torres as to how her husband had fallen. Plaintiff Olga Torres informed the doctor that

her husband had taken two pills prescribed by Dr. Colón Vargas, after which he developed dizziness.

20. It appears from the testimony given by the spouse to Dr. Llompart that, before going back to the VA Hospital, De La Cruz went to see Dr. Colón Vargas, who gave him two pills "and as he was reclining on a chair, developed some type of a seizure without falling to the floor."[1]

21. The plaintiff was admitted to the VA Hospital at approximately 1:15 a.m. on January 17, 1984, due to the fracture and dislocation in his left shoulder. (Joint Exhibit II). At approximately 12:00 p.m. on January 17, 1984, a closed reduction of the left shoulder of the plaintiff was performed by orthopedic surgeons. (Joint Exhibit II). On January 23, 1984, an open reduction and internal fixation procedure was performed on plaintiff's left shoulder. (Joint Exhibit II).

22. On January 25, 1984, De La Cruz was transferred to the Psychiatric Intensive Care Unit for treatment of his psychiatric condition. (Joint Exhibit II). De La Cruz remained hospitalized there for approximately three months. Hospitalization for such a long period was due in part to the request made by plaintiff Olga Torres that her husband not be discharged.

23. Plaintiff suffers a mild degree of difuse muscle atrophy and some limitations in the force, pressure and movement of the left hand. Although he has remained with some limitations of motions, these are not of the degree that would inhibit him from performing his usual chores at home. In addition, the bullet wound suffered in 1966, and a traffic accident which resulted in multiple trauma in 1969, together with symptoms of arthritis, are factors that might be, in whole or in part, responsible for the aforementioned limitations.

## CONCLUSIONS OF LAW

■ Under the Federal Tort Claims Act, the Government is liable in damages to an injured party for injuries arising from a negligent act or omission of its employees, if a private person would be liable under the law of the place where the act or omission occurred. 28 U.S.C. §§ 1346(b); *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976).

■ Whether the United States is liable for the negligence of its employees is a question of state law. 28 U.S.C. §§ 1346(b), 2674; *Rodríguez v. United States*, 455 F.2d 940, 941–42 (1st Cir.1972). Article 1802 of the Civil Code of Puerto Rico is the general source of law that governs the determination of liability of an individual for a cause of action in damages for negligence. 31 L.P.R.A. § 5141; *See Acha v. Nevarez*, 59 P.R.R. 235, 242 (1941). The determination of liability of a hospital in Puerto Rico, however, for the medical malpractice of one of its physicians is predicated under Article 1803, which reads:

> The obligation imposed by [section 5141] is demandable, not only for personal acts and omissions, but also for those of the persons for whom they should be responsible.

Article 1803, 31 L.P.R.A. § 5142. Under that section, a hospital may be liable for

---

1. The deposition of Dr. Llompart, plaintiff's expert witness, was admitted in evidence in lieu of his testimony pursuant to Rule 32(a)(3)(B) of the Federal Rules of Civil Procedure and the stipulation of the parties. In addition to Dr. Llompart, plaintiffs requested that another doctor, Julio V. Westerband, be allowed to testify on their behalf. However plaintiffs never filed supplemental answers to defendants' interrogatories. In addition, plaintiffs did not comply with the pretrial order which specifically stated that the parties could supplement the list of witnesses *upon application to the Court* and for good cause shown. Plaintiffs requested the Court's permission to include Dr. Westerband in the list of witnesses the day of the trial. Before that they had only filed an "Informative Motion" to inform the Court of *their* decision to call the expert. Plaintiffs revealed their intention to call this additional expert less than a week before the trial of the case was scheduled to begin. District Courts have ample discretion in refusing to permit the "eleventh hour" witnesses to testify. Accordingly, plaintiffs' request was denied in open court. *See, Davis v. Marathon Oil*, 528 F.2d 395, 403 (6th Cir.1976). *See also Johnson v. H.K. Webster, Inc.*, 775 F.2d 1, 8 (1st Cir.1985) (the test is conduct of the trial, the importance of the evidence to the proponent, and the ability of the defendants to formulate a response).

the medical malpractice of its physicians under a theory of vicarious liability. *Nuñez v. Cintrón Ortíz*, 84 J.T.S. 66 (1984).

█ The standard of care required of a hospital is that of reasonable care and attention required by the circumstances, considering the patient's conduct, his capacity to care for himself, and the hospital's actual information regarding his condition. The hospital is liable for only those damages that are reasonably forseeable and preventable and not to all those "hazards imaginable that could threaten the patient's security...." *Hernández v. The Capital*, 81 P.R.R. 998, 1005 (1960). *See also, Community Partnership v. Presbyterian Hospital*, 88 P.R.R. 379, 386–87 (1963). Thus, the care required of a hospital will depend upon the particular set of facts of each case.

█ A physician is presumed to have exercised a reasonable degree of care and to have provided adequate treatment. To prevail, the plaintiff must overcome this presumption with evidence showing more than a mere possibility that his damages were caused by the physician's lack of due care. If there are two possible causes of damage, the plaintiff must show negligence of the physician is the most probable. *Reyes v. Phoenix Assurance Co.*, 100 P.R.R. 869, 874 (1972); *Ramos v. The Capital*, 88 P.R.R. 306, 318–19 (1963). In other words, the plaintiff has the burden of proof of establishing negligence and causation by a preponderance of the evidence.

Plaintiffs contend that three negligent acts or omissions on the part of defendant's medical personnel proximately caused injuries to De La Cruz: (1) he was not provided a wheelchair with or without a posey-type of restraint; (2) the hospital failed to keep adequate medical records regarding the time of arrival of patients to the emergency ward waiting room to assure prompt attention of urgent medical needs; and (3) the hospital failed to comply with a minimum standard of screening plaintiff within

a reasonable amount of time after his arrival. As to each of these contentions, we find that plaintiffs have not established that the VA Hospital violated its duty of reasonable care under the circumstances.

With regard to the first contention, plaintiffs argue that the hospital was fully advised that De La Cruz was feeling dizzy and having difficulty maintaining his balance, and that the hospital should have provided him a stretcher or wheelchair with side restraints to prevent him from falling. They claim that the defendant's medical personnel were twice advised of his sorry medical state: (1) on plaintiffs' first arrival they informed the emergency room receptionist, and (2) at their second arrival, they told the male nurse who accompanied them from the waiting room to Dr. Díaz's office.

█ However, the record reveals that on their second afternoon arrival to the VA Hospital, De La Cruz walked unattended from the parking lot to the emergency room and immediately requested attention of a doctor, and took their seats in the waiting room. Less than two hours later, and without incident, De La Cruz walked to the doctor's office, accompanied by a male nurse, and took his seat before Dr. Díaz. Plaintiffs were unable to present credible evidence showing they informed the VA Hospital on the first morning arrival that De La Cruz was dizzy, and that they informed the receptionist.[2]

The standard of care may be higher where the patient suffers some physical or mental abnormality making it difficult to care for himself, requiring the hospital to take additional precautionary measures. *Hernández*, 81 P.R.R. at 1005–06. However, that higher standard is only required where the hospital is put on notice of the patient's deteriorated medical condition. Under the circumstances of this case, the hospital had no notice nor any reason to believe that De La Cruz necessitated any additional precautionary help. There was nothing in De La Cruz's behavior nor anything said to the Hospital that would re-

---

2. Mrs. Torres testified that her husband became dizzy after 4:30 p.m., but could not explain why in page 44 of her deposition she stated that she told the receptionist during the morning that her husband was dizzy.

quire it to place De La Cruz in a stretcher or wheelchair. Furthermore, the hospital did not know at the time of his admission that Dr. Colón Vargas had given De La Cruz two libriums, nor was there evidence to infer that in the afternoon arrival De La Cruz was intoxicated.

In sum, these facts did not require the hospital to exercise a higher standard of care. Furthermore, plaintiffs did not establish that the conduct of the hospital's medical personnel fell below the reasonable standard of care. In like manner, the Supreme Court of Puerto Rico in *Lugo Pérez v. Santo Asilo de Damas*, 89 P.R.R. 242 (1963), affirmed a trial court judgment dismissing the complaint for lack of negligence where an elderly woman patient fell from her hospital bed during her sleep and died shortly thereafter. Mrs. Serafina Ortiz, a 67 year old woman, was admitted to the Santo Asilo de Damas Hospital under the instructions of her private physician. She was to undergo an operation for cataract on both eyes, and a general examination upon admittance showed no other medical abnormality requiring any special treatment or care. The night before the operation she was given a sedative to help her rest. For unknown reasons, during the night she fell from her bed, causing a cerebral hemorrhage. The Supreme Court applied the usual rule that where hospital personnel are not notified of special circumstances requiring extra precautions, a hospital is not negligent if a patient falls from a bed and suffers damages. *Pérez*, 89 P.R.R. at 247–48. We rely on this authority in finding no negligence of the VA Hospital in not providing a stretcher or wheelchair to De La Cruz.

■ Plaintiff's second contention, which in essence is that the hospital was negligent by failing to provide De La Cruz with prompt medical attention, need not detain us long. On their first visit, plaintiffs waited less than two hours for a bed to become available at the Psychiatric Intensive Care Unit of the VA Hospital. After finding that no beds were available there, the Hospital suggested that De La Cruz seek treatment at a Veterans Administration contract hospital. The plaintiffs rejected this proposal and left the VA Hospital at around 4:30 p.m. They returned to the emergency ward of the VA Hospital at around 7:30 p.m., and waited only one hour and a half to be called by the male nurse to see Dr. Delia Díaz. Thus, on two separate occasions they waited less than two hours for medical attention; on the first visit they rejected a reasonable alternative to seek attention elsewhere and decided to wait no longer for emergency room treatment; on the second visit they waited an hour and a half for treatment. Much longer waiting periods have been held not to constitute negligence. *See Ramos v. Government of the Capital*, 88 P.R.R. 306, 319–21 (1963) (knee operation not scheduled until after sixth day of accident does not give rise to an inference of negligence.)

■ Similarly, plaintiffs' final argument, that the VA Hospital did not comply with the minimum standards for screening De La Cruz within a reasonable amount of time after this arrival, fails as well. His waiting period on both visits was very short. On the second visit he promptly filled out the admittance form. Like other emergency room patients, he patiently waited his turn. He asked for no wheelchair, nor for any special help. Less than two hours after he stepped into the hospital, after all standard procedures were complied with, he was accompanied to see Dr. Díaz. Patently, the hospital committed no negligence in screening plaintiff.

For the above announced reasons, plaintiffs' complaint must fail. No negligence was established. Accordingly, the complaint is DISMISSED.

The Clerk shall enter Judgment accordingly.

IT IS SO ORDERED.