

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-16-1994

# Habecker v. Clark Equip. Co.

Precedential or Non-Precedential:

Docket 93-7177

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Habecker v. Clark Equip. Co." (1994). *1994 Decisions.* Paper 137.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/137

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-7177

_____


CONNIE L. HABECKER, Individually and as Personal
Representative of the Estate of JOHN R. HABECKER,
Deceased; JOHN MICHAEL HABECKER, Minor, by CONNIE
L. HABECKER, his Parent, Natural Guardian and
Next Friend,

                            Appellants

                vs.

    CLARK EQUIPMENT COMPANY; FORKLIFTS, INC.
                    _____

    Appeal from the United States District Court
        for the Middle District of Pennsylvania
              (D.C. Civil No. 86-00352)
                    _____

                    Argued
              January 25, 1994
    Before:  MANSMANN, NYGAARD and SEITZ, <u>Circuit</u> <u>Judges</u>.

            (Filed September 16, 1994)
                    _____

Richard W. Hollstein, Esquire (Argued)
CLARK LADNER FORTENBAUGH & YOUNG
2005 Market Street
One Commerce Square - 22nd Floor
Philadelphia, PA  19103

Stanley B. Boychuck, Esquire
SWANSON, MARTIN & BELL
One IBM Plaza
Chicago, IL  60611

        Counsel for Appellee - Clark Equipment Company

John A. Statler, Esquire (Argued)
GOLDBERG, KATZMAN & SHIPMAN, P.C.
320 Market Street
Strawberry Square
P.O. Box 1268

Harrisburg, PA 17108-1268

Counsel for Appellee - Forklifts, Inc.


Samuel Posner, Esquire
Gerald F. Posner, Esquire (Argued)
712 Penobscot Building
Detroit, MI 48226

Counsel for Appellants

_____

OPINION OF THE COURT
_____

MANSMANN, <u>Circuit</u> <u>Judge</u>.

We are revisiting this products liability case after a third trial on the alleged defectiveness of a forklift for its manufacturer's failure to equip it with an operator restraint system. We focus specifically on issues related to the forklift's crashworthiness under Pennsylvania law. Our task is to determine whether the district court's evidentiary rulings, permitting evidence proffered by the defendant-manufacturer pertaining to its lack of knowledge of such devices at the time of the sale, the state of the art, and the desirability of such restraints as viewed by the industry, were consistent with Pennsylvania's crashworthiness law and its public policy which underlies it.


I.

John Habecker was a civilian employee of the New Cumberland Army Depot when the forklift he was backing down a ramp tumbled from the side of the ramp. Thrown from the

forklift, Habecker was tragically killed when the forklift fell on top of him. The forklift was manufactured in 1977 by Clark Equipment Company and was not designed with an operator restraint system (ORS), nor had one subsequently been installed.

Habecker's estate and family[1] ("Habecker") brought a products liability action in the United States District Court for the Middle District of Pennsylvania against Clark and Forklifts, Inc., the corporation that leased the forklift to the Army, alleging that the forklift was defective due to the lack of an ORS, for example, a seat belt.[2] After trial, the jury returned a verdict for the defendants.

On appeal, we reversed and remanded for a new trial on the operator restraint issue, reasoning that the district court erred in refusing to permit Raymond Brandt to testify as an

---

[1]. Habecker's wife, Connie L. Habecker, brought this suit individually and as personal representative of his estate, as well as on behalf of Habecker's son, John Michael, as parent, natural guardian and next friend.

[2]. Originally suit was also brought against Copperloy Corporation, the maker of the ramp, and the claims against all parties included strict liability, breach of implied warranty and negligence. The implied warranty and negligence claims were dismissed prior to the first trial. The strict liability theories were based on alleged defects in both the forklift and the ramp. Habecker submitted that the forklift was defective because it had a sticking throttle and had not been designed with an ORS. The ramp was allegedly defective because it lacked adequate instructions on how to properly secure it and because it did not have an overload relief valve that would keep it from overturning.

expert for the plaintiffs.  Habecker v. Copperloy Corp., 893 F.2d 49, 52–53 (3d Cir. 1990) (Habecker I).[3]

In that appeal, Habecker had also argued that the district court erred by continually admitting, over objections, extensive testimony and evidence about industry standards, government regulations, and other "state of the art" matters concerning operator restraints, asserting that such evidence was inadmissible in a products liability suit governed by Pennsylvania law.  We found it unnecessary to address this issue because the case had to be retried.  Nonetheless, we stated: "The district court has recognized the problem, and we are confident that it will carefully limit the admissibility of such evidence on re-trial."  Id. at 53.

Finally, Habecker argued that the district court, in eliminating the retrofit issue, also dismissed the issue of failure to give a post-sale warning.  We expressly held that the district court only eliminated the failure-to-retrofit issue, not the failure-to-give-a-post-sale-warning issue.  Id. at 54.

On retrial, the district court permitted Clark to offer evidence relating to its theory of the effectiveness of ORSs in 1977, demonstrating that the industry had been unable to determine whether ORSs reduced the risk of serious injury to the operator and that it was only later, after the development of

---

[3].      Additionally, we affirmed the district court's grant of a directed verdict in favor of Copperloy for lack of a substantial factor supporting causation, and we affirmed the court's grant of a partial directed verdict in favor of Clark and Forklifts on the defective throttle issue.

more sophisticated computer modeling, that the industry decided

it was desirable to equip forklifts with such systems.  Clark

argued that as of 1977 a manufacturer could not have known

whether ORSs created more risks than they eliminated.  Once again

the jury returned a verdict for the defendants.

On appeal, in Habecker v. Clark Equipment Co., 942 F.2d

210 (3d Cir. 1991) (Habecker II), we distinguished evidence of

what safety measures were feasible at the time a product was

designed and evidence of what safety measures were known to be

desirable at that time.  Noting that this case was one of

crashworthiness, we held that "[l]iability is imposed on a

manufacturer in a case for a design defect because an

alternative, feasible, safer design would have lessened or

eliminated the injury plaintiff suffered."  Id. at 215.  We

concluded that:

> "[i]f no such alternative feasible design
> existed when the product was manufactured,
> then the design cannot be said to be
> `defective,' even if more recent technology
> has rendered a safer design feasible.
> Therefore, the factfinder can only determine
> whether a particular design was defective
> after hearing evidence about what designs
> were feasible at the time the product was
> manufactured and whether they were in fact
> safer."

Id.  We excluded, consistent with Pennsylvania law, any evidence

of what was or was not known about the desirability of ORSs in

1977.

> [T]he only question for the jury was whether
> an operator restraint system is an "element
> necessary to make [a forklift] safe for its
> intended use," Azzarello, 391 A.2d at 1027, a

> question that is to be answered on the basis
> of all the knowledge available at the time of
> trial.  Evidence about what Clark knew or
> could have known about the desirability of
> operator restraint systems at the time of
> manufacture is not relevant to that question.

Id. at 216.  We found that there was a substantial possibility that the inadmissible evidence influenced the jury's determination, focusing its attention on Clark's behavior and decision-making rather than on the product's defectiveness.

Finally, we held that the district court took a narrow view of its own authority on remand.  While the parties were preparing for the second trial, the district court issued an order stating that pursuant to our opinion in Habecker I, the only issue for re-trial was whether the forklift was defective when it left Clark, the manufacturer, in 1977.  The district court held that the parties would be confined to presenting evidence only through the witnesses listed in their original pre-trial memorandum.  The order prevented Habecker from further discovery and from raising new theories of liability.  We stated that it was not our intention to so restrain the second trial, and although we expressed no view on the direction the district court should take, we held only that the decisions on whether to allow new claims, whether to permit further discovery, and whether to hear additional evidence were all within the district court's discretion.

On remand for the third trial, but prior to it, Habecker filed a motion to exclude all state of the art evidence as well as letters and studies purporting to show the dangers of

ORSs in forklift turnovers.  There was extensive discussion on this issue in chambers at the pretrial conference on January 29, 1993.  Clark argued that Habecker II permitted evidence of feasibility in a crashworthiness case, i.e., that if Habecker offered the 1983 ORS as an "alternative, safer design, practicable under the circumstances," Habecker II at 214; see also Kupetz at ____, then defense evidence of its feasibility in 1977 would become relevant.  The district court granted Habecker's motion, but in consideration thereof, limited Habecker to general evidence about ORSs -- excluding any evidence about the 1983 ORS.  631A.

Further, the district court permitted, over strenuous and continuous objections, defense testimony about user letters and concerns pertaining to ORSs, engineering concerns, and concerns of various corporations, committees and societies, all of which impact the knowledge available to Clark regarding the ORSs' desirability.  The jury returned a defense verdict, and Habecker now appeals once more.

II.

A.

Since the adoption of Section 402A of the Restatement (Second) of Torts,[4] the Pennsylvania Supreme Court has remained

---

[4]. (1)  One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the

faithful to its view that negligence concepts have no place in a products liability trial.  See Lewis v. Coffing Hoist Div., Duff–Norton, 528 A.2d 590, 593 (Pa. 1987).[5]  The test for defectiveness is whether the "product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use."  Azzarello v. Black Bros. Co., 391 A.2d 1020, 1027 (Pa. 1978).  "[I]t is the product itself which is on trial, and not the manufacturer's conduct."  Lewis, 528 A.2d at 593.  In

(..continued)
> business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2)  The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Webb v. Zern, 220 A.2d 853, 854 (Pa. 1966) (quoting Restatement (Second) of Torts § 402A (1965)).

[5].      In Lewis the Court also endorsed our opinion in Holloway v. J. B. Systems, Ltd., 609 F.2d 1069 (3d Cir. 1979) (holding that it was inappropriate to admit evidence of industry standards and practices in a products liability trial).  Lewis, 528 A.2d at 594.  See also Azzarello v. Black Bros. Co., 391 A.2d 1020, 1027 (Pa. 1978) (holding that the term "unreasonably dangerous" has no place in the instructions to the jury in a products liability case); McCown v. International Harvester Co., 342 A.2d 381 (Pa. 1975) (rejecting contributory negligence as a defense to actions grounded in products liability); Berkebile v. Brantly Helicopter Corp., 337 A.2d 893 (Pa. 1975) (holding that, for policy reasons, a manufacturer should be the guarantor of its products' safety, reasoning that the distinction between strict liability and negligence is that the exercise of due care in strict liability cases is absolutely irrelevant).

Lewis, a case concerning the defectiveness of a control box for a hoist, the Pennsylvania Supreme Court held:

> Having reached the conclusion that evidence of industry standards relating to the design of the control pendent involved in this case, and evidence of its widespread use in the industry, go to the reasonableness of the appellant's conduct in making its design choice, we further conclude that such evidence would have improperly brought into the case concepts of negligence law.  We also conclude that such evidence would have created a strong likelihood of diverting the jury's attention from the appellant's control box to the reasonableness of the appellant's conduct in choosing its design.  For those reasons we conclude that the trial court correctly ruled the evidence to be irrelevant and hence inadmissible.  It is well established that a trial court should exclude evidence which has a tendency to distract the jury from its main inquiry or confuse the issue.

Id. at 594.  For a general discussion of the development of products liability law in Pennsylvania see Dillinger v. Caterpillar Inc., 959 F.2d 430, 435-37 (3d Cir. 1992).


                              B.

        The parties agree that this case focuses on the crashworthiness of the forklift.  In Habecker II we noted that although the Pennsylvania Supreme Court had yet to adopt the crashworthiness doctrine for products liability cases, we had previously predicted that it would adopt it, Habecker II, 942 F.2d at 214 (citing Roe v. Deere & Co., 855 F.2d 151, 153 n.2 (3d Cir. 1988)).  We explained that "[u]nder the doctrine of crashworthiness, the manufacturer's liability for producing

defectively designed products includes the liability for failing to provide safety features and liability for providing inadequate safety features.[6] Habecker II at 213.  In other words, the crashworthiness doctrine imposes liability on the manufacturer not for causing the accident, but rather for failing to minimize the injuries or even increasing the severity of the injuries sustained in an accident brought about by a cause other than the alleged defect.  We further discussed our previous decision in Huddell v. Levin, 537 F.2d 726 (3d Cir. 1976), where we predicted that the New Jersey Supreme Court would adopt the crashworthiness doctrine and set forth the criteria required for a prima facie case.[7]

We viewed our task in Habecker II as predicting the definition the Pennsylvania Supreme Court would give the crashworthiness doctrine and specifically, what evidence it would find relevant in determining liability.  Id.  We distinguished between evidence of feasibility and evidence of desirability, although we did not expressly predict the adoption of the Huddell criteria for Pennsylvania law.  Recently the Pennsylvania

---

[6].    The theory of products liability is applied to three types of defects:  design, manufacturing, and marketing (warnings).  The crashworthiness doctrine implicates the overtures of design defects.

[7].    There we held that the plaintiff must establish (1) that the design in question was defective, offering proof of an alternative, safer design, practicable under the circumstances; (2) what injuries, if any, would have resulted had the alternative, safer design been used; and (3) the extent of enhanced injuries attributable to the defective design.  Habecker II at 214 (quoting Huddell v. Levin, 537 F.2d 726, 737–38 (3d Cir. 1976)).

Superior Court issued an opinion expressly recognizing the crashworthiness doctrine as a theory of recovery in Pennsylvania and requiring the establishment of the same criteria we set forth in Huddell for a successful crashworthiness case.  Kupetz v. Deere and Co., LEXIS 1621 (Pa. Superior 1994).[8]  In Kupetz the Superior Court stated:

> The principle behind the "second collision" concept is that, because the way the vehicle has been manufactured, a person's injuries have been aggravated unnecessarily; and such a concept has equal applicability, whether the person's second collision is with the interior of the vehicle or the exterior ground.
>
> The effect of the crashworthiness doctrine is that a manufacturer has a legal duty to design and manufacture its product to be reasonably crashworthy.  In terms of strict product liability, this means that a manufacturer has to include accidents among the "intended" uses of its product.  A manufacturer who fails to fulfill this legal duty will be liable to the passenger of a car whose injuries are increased due to the design defect in the automobile.  Liability will attach even though the defect in manufacture or design did not cause the initial accident or impact.

---

[8].     Shortly after the adoption of § 402A in Webb, the Pennsylvania Supreme Court held that "lack of proper safety devices can constitute a defective design for which there may be recovery."  Bartkewich v. Billinger, 247 A.2d 603, 605 (Pa. 1968).  Further, in McCown v. International Harvester Co., 342 A.2d 381 (Pa. 1975), the Court recognized that in a products liability action the defect itself did not have to be the cause of the accident.  McCown was permitted to recover where the defect was not the cause of the collision, but did cause his injuries.  These cases provided the basis for the Superior Court's determination that the Pennsylvania Supreme Court has implicitly adopted the crashworthiness doctrine.  Kupetz at 11–17.

Id. at 12-15 (citations omitted).[9]

A products liability cause of action in Pennsylvania has three requirements; it must be shown that: (1) the product was defective, (2) the defect existed while the product was in the control of the manufacturer, and (3) the defect was the proximate cause of the injuries. Walton v. Avco Corp., 610 A.2d 454, 458-59 (Pa. 1992). The Superior Court in Kupetz, however, explained that to establish a cause of action on a crashworthiness theory, a subset of a products liability action, it must be shown: (1) that the design of the vehicle was defective; 2) that when the design was made, an alternative, safer design, practicable under the circumstances existed; (3) what injuries, if any, the plaintiff would have received had the alternative, safer design, been used; and (4) what injuries were attributable to the defective design. We predict that the Pennsylvania Supreme Court will adopt the view set forth in Huddell and then subsequently by the Superior Court in Kupetz. As we have already held in Habecker II that this is a crashworthiness case, we must analyze the district court's conduct of the trial pursuant to the analysis set forth in Kupetz.[10]

---

[9]. We note that for the elements of the crashworthiness doctrine, Kupetz cited Dorsett v. American Isuzu Motors, Inc., 805 F. Supp. 1212, 1218 (E.D. Pa. 1992), which cited Habecker II and Huddell for the same language. It also cited Craigie v. General Motors Corp., 740 F. Supp. 353, 356-57 (E.D. Pa.), in which the court analyzed Huddell.

[10]. The record establishes that the district court conducted the second trial as a crashworthiness case, pursuant to the elements set forth first in Huddell and then in Habecker II.

III.

A.

Habecker argues that the district court erred in permitting defense testimony regarding the knowledge available to Clark at the time of the forklift's design about the desirability of ORSs. A corollary is Habecker's argument that the district court erred in forcing her to elect whether to refrain from offering any evidence about the 1983 ORS or to admit it and "open the door" for Clark to counter with evidence concerning the state of the art, industry standards, its conduct in the development of the 1983 system, and why the 1983 ORS was not feasible in 1977.[11] 635A–36A. We review these decisions for abuse of discretion, but to the extent the district court's rulings were predicated on an erroneous interpretation of law, our review is plenary. In re Japanese Elec. Prod. Antitrust Litig., 723 F.2d 238, 257 (3d Cir. 1983), rev'd on other grounds, 475 U.S. 574 (1986).

Clark had created two safety videos depicting the breakthrough in technology that enabled it to design the 1983 ORS, and demonstrating the system's superiority. The target

_____

[11]. The 1983 ORS was invented in 1983 and then patented in 1986. It was allegedly not apparent until 1983, with the advent of proper computer technology, that Clark was able to determine that some type of ORS was safer than nothing at all. The evidence at the second trial suggested that as of 1977, Clark could not have known whether an ORS created more risks than it eliminated. Habecker II at 213. We held in Habecker II that it was irrelevant to the issue of defectiveness when the industry determined that placing an ORS on a forklift was more desirable than not.

audience was forklift drivers in general, and the videos described what to do in the event of a rollover accident. During trial Habecker attempted to offer the Clark videos as evidence in rebuttal to Frank Entwisle's testimony, but was not permitted to do so (1729a). Entwisle's testimony included, inter alia, the contents of the user letters, concerns, and objections to seat belts, and the California Department of Industrial Relations' decision not to require an ORS on forklifts (1562a-71a). He also testified about the concerns engineers had in deciding whether to put on a seat belt (1575a-86a); that in 1977 there was no literature or scientific studies available which indicated seat belts were safer (1578a); the opinion and concerns of the American Society of Mechanical Engineers (1589a-94a); that General Motors had opinions against seat belts (1607a); and the lack of a recommendation for an ORS in the National Safety Council Manual in effect during 1977 (1645a-46a). Additionally, Entwisle testified that in 1977 there was no acceptable ORS that could be put on a forklift because the 1983 ORS was not patented until 1986 (1591a, 1595a, 1603a-1604a).

Clark argues that the purpose of Entwisle's testimony was to clarify that operator restraint systems similar to the 1983 ORS did not exist in 1977 (1514a-15a). This argument, Habecker contends, despite Clark's admission of feasibility,[12] is

---

[12]. We noted in Habecker II that Clark conceded that an ORS would have been feasible in 1977 (261a). Clark interprets its "admission" of feasibility at the second trial, that seat belts and wings could be placed on a forklift, not to constitute an admission of the feasibility of all other particular ORS designs. The district court, in a thorough opinion, ruled that the

unequivocally impermissible in a Pennsylvania products liability trial. We agree. Clark insists that Habecker misrepresents the record when it states that this information was offered to show knowledge, conduct, desirability or state-of-the-art.[13] Habecker argues that the evidence Clark introduced is precisely what Habecker II held to be improper, that Clark's evidence is inadmissible and improperly focuses the jury's attention on Clark's conduct, rather than on the forklift itself. Again, we agree.

Clark contends that there is a qualitative difference between one type of ORS (automotive seat belt and wing) and another (the 1983 ORS). Clark has consistently argued throughout this litigation that while the automotive seat belt and some type of wing design was feasible in 1977, it was not safer. Conversely, the 1983 ORS design was not feasible in 1977, although it may be safer in some circumstances. According to Clark, our result denies it a jury trial because it forces the jury to treat differing types of operator restraint systems

(..continued)
defendant had only admitted the feasibility of a seat belt and some type of wing (423a). Habecker argues that the district court's interpretation of Clark's admission constitutes reversible error. We note that in Habecker II we held that Clark had conceded that an ORS was feasible in 1977. We must affirm the district court's decision here absent an abuse of discretion. We see no abuse here.

[13]. Clark insists the testimony was offered so that the jury would be able to evaluate the opinion of Mr. Entwisle based upon those studies which existed and which formed the basis of his opinion.

identically. It is essentially deprived of presenting the feasibility of its ORS to the jury.

Clark forcefully argues that design evolution and the question of feasibility are linked together in that, over time, safety features are invented. Clark opines that it is common knowledge that the first design of a product may be altered and improved drastically over the years as new technologies are incorporated. Although the design of the Model T was feasible 60 years ago, current automobile designs were not; for example, air bags and anti-lock brakes are recent safety improvements.

### B.

In Pennsylvania the arguments Clark propounds are irrelevant. Pennsylvania's public policy is such that manufacturers of products are encouraged to make them as safe as possible, as soon as possible. In Azzarello v. Black Bros. Co., 391 A.2d 1020, 1024 (Pa. 1978), the Pennsylvania Supreme Court stated that the supplier of a product is the guarantor of its safety. In that regard, evidence of Clark's conduct is absolutely irrelevant. The forklift is on trial here, Lewis v. Coffing Hoist Div., Duff-Norton, 528 A.2d 590, 593 (Pa. 1987); nothing Clark did or knew in its decision making capacity or design choice is relevant to that inquiry.[14]

---

[14]. Pennsylvania is not alone in emphasizing the safety of the product, rather than the manufacturer's conduct, in design defect cases. See, e.g., Barker v. Lull Eng'g Co., 573 P.2d 443, 447 (Cal. 1978) (emphasizing its "continued adherence to the principle that, in a product liability action, the trier of fact must focus on the product, not on the manufacturer's conduct");

In *Habecker II* we distinguished between feasibility and desirability. *Feasibility* means:  1) capable of being done,

(..continued)
*Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 207 (N.Y. 1983) (stating that in a design defect case, "[t]he focus shifts from the conduct of the manufacturer to whether the product, as designed, was not reasonably safe . . . .  A manufacturer is held liable regardless of his lack of actual knowledge of the condition of the product").

Other states disagree.  *See*, *e.g.*, *Prentis v. Yale Mfg. Co.*, 365 N.W.2d 176, 184 (Mich. 1984) (stating that "[a]lthough many courts have insisted that the risk-utility tests they are applying are not negligence tests because their focus is on the product rather than the manufacturer's conduct, . . . the distinction on closer examination appears to be nothing more than semantic . . . .  The underlying negligence calculus is inescapable"); *Feldman v. Lederle Lab.*, 479 A.2d 374, 385 (N.J. 1984) (stating that "[w]hen the strict liability defect consists of an improper design . . . reasonableness of the defendant's conduct is a factor in determining liability").  *See also Lewis v. Coffing Hoist Div., Duff-Norton*, 528 A.2d 590, 593-94 (Pa. 1987).

The rationale for strict liability was originally adopted for defective products, that is, products that were not as the manufacturer intended.  Manufacturers were deemed to be in the best position to provide "insurance" against accidents by spreading the cost of accidents among all consumers of the product.  The theory concludes that manufacturers would self-impose the most efficient level of care if they were held liable for defects.  Restatement (Second) of Torts § 402A cmts. a-d (1965).  Furthermore, manufacturers have better access to information about their manufacturing processes.  Thus, the theory maintains that it is sensible to require manufacturers to come forward with this information.

This rationale is not on all fours with design defects, where the product is as the manufacturer intended.  *See*, *e.g.*, *Prentis*, 365 N.W.2d at 185 (discussing the incompatibility of strict liability and design defects).  For example, cost spreading is not effective when the entire product line is defective and every consumer is equally at risk, and further the rules of discovery detract from the information-access argument. We acknowledge, however, that a strict liability regime, as opposed to negligence, does provide manufacturers with added incentive to design their products with care.

executed, or effected, possible of realization; 2) capable of being managed, utilized, or dealt with successfully. Webster's Third New International Dictionary of the English Language Unabridged. Desirability means the quality, fact, or degree of being desirable or having worth, and desirable means worth seeking or doing as advantageous, beneficial or wise. Id. We acknowledge the district court's strenuous effort to attempt to follow our mandate from Habecker II. The line between feasibility and desirability is certainly a fine one. To argue the lack of feasibility is to argue that the 1983 ORS was incapable of being placed on the forklift in 1977 for some reason other than its nonexistence, possibly a mechanical incompatibility. The fact that the 1983 ORS did not exist in 1977, although an intuitively attractive argument, does not mean that it was incapable of being placed on the truck in 1977 if it did in fact exist.

Therefore, we find that the user letters, concerns, and objections to seat belts are inadmissible; as is the engineers' lack of knowledge whether seat belts would indeed be safer. They are in response to desirability, that is, whether it was advantageous to put ORSs on forklifts. A viable argument would be that the 1983 ORS is not safer, or would not have helped in this situation, although we realize the inconsistency such a position would have in light of the videotapes depicting Clark's ardent support for the 1983 ORS. As we said in Habecker II, the decision is made with all available knowledge at the time of the trial. That is simply the nature of strict liability in

Pennsylvania.  As stated above, Pennsylvania's public policy is to encourage manufacturers to make their products as safe as possible, as soon as possible.  It is the jury's prerogative to hold a manufacturer responsible for not more aggressively researching and implementing safety devices.

All this must be integrated with what we said in Huddle regarding crashworthiness, that is, that a plaintiff must show that an alternative, safer design practicable under the circumstances existed.  In Pennsylvania, "practicable under the circumstances" is an element militating toward feasibility. Practicable means possible to practice or perform, capable of being put into practice, done, or accomplished, feasible. Websters' Third New International Dictionary of the English Language Unabridged.  Therefore, like feasibility, that element bars the admission of the evidence Clark would like to present regarding the 1983 ORS's non-existence.[15]

On remand, the district court must conduct a new trial based exclusively on the principles of Pennsylvania crashworthiness law we have described.  Thus, Habecker may admit any evidence that demonstrates a safer design, including the Clark videos and anything else depicting the technology that was feasible in 1977.  The defendants may not counter with evidence that the 1983 ORS was not in existence at the time of manufacture, nor shall it be permitted to offer any evidence

---

[15].     Habecker raises two other issues that, because of our result here, have become moot:  (1) jury instructions; and (2) misconduct in questioning.

regarding the knowledge of desirability, including the knowledge of any corporations, societies, or committees.[16]  They may offer evidence which impacts upon the safety of the ORS suggested by Habecker, and/or its feasibility in 1977.

## IV.

Habecker raises a number of issues that were categorically a matter for the district court's discretion.  We emphasize that we review these issues under an abuse of discretion standard, and we will not substitute our judgment for that of the district court unless there has been an abuse of discretion.  Stich v. United States, 730 F.2d 115, 117 (3d Cir. 1984).

## A.

Habecker argues that it was an abuse of discretion for the district court to refuse to allow the plaintiff to raise on retrial the issue whether the forklift was defective due to the lack of post-sale warnings.  Habecker was under the mistaken belief at the first trial that the district court's elimination of the retrofit issue also precluded the issue of failure to give a post-sale warning of defectiveness.  In Habecker I we held that Habecker's assumption was erroneous and that the district court did not rule on the issue of post-sale warnings regarding

---

[16].      While accepting the testimony for qualifying expert witnesses, the district court must be careful to scrutinize for this type of evidence.

defectiveness.  Id. n.4.  At the second trial the district court took a narrow view of its discretion and only permitted one issue to be tried -- whether the forklift was defective when it left the manufacturer because it lacked a seat belt or an operator restraint system.  Habecker II at 217.

After the second trial had taken place, the Pennsylvania Superior Court issued an opinion recognizing a post-sale duty to warn in Pennsylvania.  Walton v. Avco Corp., 557 A.2d 373 (Pa. Super. 1989); allocatur granted, 568 A.2d 1245, 1249 (Pa. 1989).  Habecker moved for permission to raise the post-sale-duty-to- warn issue at the third trial.  The district court denied the motion for a number of reasons:  (1) the Walton case was in conflict with other Superior Court cases; (2)  the district court distinguished the facts of this case from the facts of Walton; (3) the Walton case was the only case in Pennsylvania recognizing such a duty; and (4) the opinion itself warned that the duty was only to apply to "unique and costly products" and not "household goods."  The district court concluded that forklifts, unlike the helicopters in Walton, militate toward the common product side of the spectrum.

Prior to the start of the third trial, the Pennsylvania Supreme Court issued its opinion in Walton, affirming the Superior Court's decision on the post-sale duty to warn.  Walton v. Avco Corp., 610 A.2d 454 (Pa. 1992).  Habecker then filed a motion for reconsideration with the district court; however, the district court remained faithful to its initial analysis of the case.  The court held:

As an initial matter, the court wishes to underline the procedural footing of this motion. The court is not in a position where it is deciding a motion to dismiss prior to trial; instead, the court is merely weighing whether or not, in its discretion, it believes that Plaintiffs should, going into a retrial, be permitted to pursue a cause of action which had been neither pled nor pursued at the prior trial.

538A.

The court noted that the Pennsylvania Supreme Court's decision in Walton rendered invalid two of its four justifications -- numbers 1 and 3 -- for denying Habecker's motion to proceed with a post-sale duty to warn claim. The court also noted that factors 2 and 4 of its earlier opinion remained firm and weighed against permitting Habecker to raise this claim. Accordingly, the district court exercised its discretion and denied Habecker's motion for reconsideration, thus excluding a post-sale duty to warn claim as set forth in Walton v. Avco.

We have consistently recognized that the assertion of new issues on retrial is typically within the sound discretion of the district court. As presider over the trial, the district court is in the best position to control all aspects of trial, including further motions, discovery and court time. We cannot say that the district court did not exercise sound discretion in denying Habecker's motion.

As alternative support for this result, Clark and Forklifts submit that Habecker did not raise this issue in the first amended complaint and that it was not until the pretrial memorandum that it was raised. There are two types of warnings

at issue here: (1) a warning to operators not to jump during a lateral turnover; and (2) the post-sale duty to warn of a defective product. A review of the pleadings prior to the first trial demonstrates that Habecker did raise an issue regarding warnings: "Lack of adequate warnings and/or instructions." 53A. Federal Rule of Civil Procedure 8 only requires notice pleading; therefore, Habecker did not need to specify what type of warnings were lacking. We note, however, that the district court subsequently granted motions for summary judgment for Clark and Forklifts "on the issue of warnings." Order of October 14, 1988 -- 122A. Therefore it appears to us that if Habecker was intending to take advantage of notice pleading by not expressing the type of warning being raised, then the district court's order dismissing any issue regarding warnings would encompass whatever was intended.[17]

We also notice that the district court stated in its memorandum opinion of March 31, 1992 that Habecker had opted not to pursue a cause of action for post-sale duty to warn at the first trial because the law was unsettled with regard to whether such a failure to give post-sale warnings would give rise to a strict liability cause of action in Pennsylvania. Memorandum of March 31, 1992, 412A. Further, we are impressed by the discussion in chambers prior to the second trial. 725A-27A. Counsel for Clark explained to the court that the only issue

---

[17]. We note that in Habecker I we held that the district court did not address the post-sale duty to warn. It appears that this is because Habecker did not raise it.

regarding the duty to warn raised at the first trial was the duty to warn not to jump from the forklift. Notably, argument before the magistrate judge included only that pertaining to the duty to warn not to jump during a lateral turnover. There was no other warning issue pursued at trial, no evidence admitted, no argument to the jury and no points for charge requested on post-sale duty to warn.

Therefore, we are led to the inevitable conclusion that the district court acted well within its discretion in refusing to allow Habecker to pursue the post-sale-duty-to-warn issue. Nonetheless, in accord with Habecker II, we will again refrain from expressing a view on whether the district court should permit a new theory of liability to be pursued on retrial. The matter will be left to the sound discretion of the district court. Id. at 218.[18]

---

[18]. Habecker also argues that the district court abused its discretion in restricting them to the evidence, witnesses, and testimony from the first trial. We held in Habecker II that such rulings were within the district court's discretion and the district court has issued a sound opinion on this issue. Our review does not reveal an abuse of discretion.

Similarly, Habecker argues that the district court abused its discretion in denying the request to compel answers to interrogatories from 1987. The district court addressed this issue twice, the second time in a well reasoned opinion. We see no abuse of discretion.

Finally, Habecker argues that the district court abused its discretion in restricting the scope of cross-examination of two defense experts. Specifically, Habecker wanted to question the experts on matters the experts had noted in their files but which they did not rely on for their opinion. We find no abuse of discretion here.

B.

Habecker argues that the district court abused its discretion in refusing to allow the issue of whether the forklift was defective when it was leased in 1983 and 1984. Strict liability in Pennsylvania is extended to all suppliers of a product that is "consumed" by the public. Francioni v. Gibsonia Truck Corp., 372 A.2d 736 (Pa. 1977). Forklifts, which leased the forklift to the government, could possibly be liable to Habecker under such a theory. At the first trial Habecker chose not to pursue this issue "for tactical reasons." Memorandum Opinion of March 31, 1992 -- 410A. Prior to the third trial, Habecker filed a motion asking the district court to reinstate this claim. The district court denied the motion, relying heavily on the argument by the defendants that to permit Habecker to pursue the lease claims now would work an extreme prejudice on Forklifts due to its reliance on Habecker's actions and representations prior to the first trial.

Prior to the first trial Habecker dismissed all negligence claims. Because Habecker was not pursuing the defectiveness of the forklift in 1983 and 1984 and because the negligence claims against Forklifts had been dropped, Forklifts had no need to maintain its third party action against the United States. As a result, Forklifts dropped the United States from the lawsuit.[19]

---

[19]. Forklifts had an indemnity agreement contained in the written lease for the forklift with the United States New Cumberland Army Depot. The United States agreed to "save and

Habecker argues that Forklifts' reasons for dismissing its third party complaint against the government had nothing to do with Habecker's decision not to pursue the negligence claims against Forklifts. The district court, which was in the best position to monitor what had transpired, disagreed. The record does not indicate why Habecker chose not to pursue the defectiveness of the forklift at the time of its lease; however, it is clear that Habecker made that choice. Therefore, we find that the district court did not abuse its discretion in denying Habecker's motion to pursue the defectiveness of the forklift during the 1983 and 1984 leases.

## C.

Habecker argues that the district court abused its discretion by refusing to allow the testimony and photographs of David Wile, the New Cumberland Army Depot's Safety Director. After the accident Wile conducted an investigation and attempted to simulate the accident. Wile was never listed in a discovery response or pretrial memorandum as an expert witness, and as a result, the district court refused to recognize Wile as an expert. The district court was certainly entitled to enforce its pretrial order, requiring the listing of witnesses in compliance with discovery requests by limiting Habecker to the experts identified in the witness list and in responses to

(..continued)
hold harmless Forklifts, Inc. from any and all claims or suits
. . . ."

interrogatories requesting the identity of experts and the substance of their testimony. Franklin Music Company v. ABC, 616 F.2d 528, 539-40 (3d Cir. 1979). Such an order will not be disturbed absent a clear abuse of discretion. Id.

As a second basis for its ruling, the district court held that Wile's simulation was not reliable, and that certain factors were missing which would cause problems for the other experts. The record demonstrates that Wile did not have an engineering degree and had never taken a course in structural engineering or biomechanical engineering. Nor has he had any training in dynamics, physics or kinematics. In fact, Wile testified that he had never heard of the word "kinematics." His experience in mathematics, physics and dynamics arises from a layman's point of view. He testified that he was not a trained mechanic but did have mechanical abilities.[20]

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993), the Supreme Court has recently explained that the district court must ensure that any and all scientific testimony or evidence is reliable. Further, Federal Rule of Evidence 702 requires that the evidence or testimony assist the

---

[20]. Wile has a degree from Penn State in social science. He worked for State Farm Insurance Company for four years as an accident investigator and damage appraiser. While with State Farm he received training in accident occurrence and recreation, and how to record and document evidence. During his employment with the United States government, Wile took courses involving occupational safety and health, industrial safety, industrial hygiene and accident investigation. Wile cautioned that his training did not involve engineering or physics and that the government would hire a specialist in that area if that expertise was needed.

trier of fact in understanding the evidence or a fact in issue. This question, the Supreme Court held, goes to relevance.[21] Id. at 2795 (citing United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985) (approving of Judge Becker's description of "fit")). The test entails the district court's preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether it can be applied to the facts in issue. Id. at 2796.

To that end we note that during the simulation the ramp was pulled away from the trailer instead of moving on its own. There was no operator on the forklift nor was there cargo on the fork. The height of the fork was disregarded and the rearward movement of the forklift was not replicated. Although Wile recognized the velocity of the forklift as an important effect, he made no attempt to duplicate it. The district court held that the attempt at the accident simulation was unreliable. Further, although not stated by the district court, it appears that the evidence from Wile's simulation does not "fit" the facts of this case and would not assist the trier of fact in determining how the accident occurred.

Therefore, in light of the test set forth in Daubert, we hold that the district court did not abuse its discretion in

_____

[21]. We had held in Habecker I that the proffered knowledge, skill, experience, training or education possessed by an expert goes to the weight of the testimony not its admissibility. However, recently, the United States Supreme Court held that the test set forth in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), has been displaced by the Federal Rules of Evidence.

refusing to allow Habecker to admit Wile as an expert or to permit him to testify about his report.

D.

Habecker complains that the trial court abused its discretion in failing to strike the testimony of Dr. Cline Turner Young, which was based on facts contrary to the facts stipulated by the parties. Specifically, Habecker argues that the parties agreed that the forklift fell only one foot rather than four feet as Dr. Young opined. However, our review of the stipulations read to the jury reveals that no distance was specified. In fact, our review of Dr. Young's testimony reveals that he was calculating the change in forces if the forklift dropped only one foot, where the chance of a brain injury fatality would be 90%, as opposed to a four foot drop, where the chance of a brain injury fatality would be "99 plus, plus, plus percent." It appears that Dr. Young believed that Mr. Habecker would have died as a result of the accident whether the forklift fell one foot or four feet.

Contrary to Habecker's assertion, the record reveals that Dr. Young's testimony was confined to hypotheses consistent with the evidence before the jury. Dr. Young carefully explained every step of his analysis and cited the sources of each piece of his data. Further, it does not appear that Dr. Young's testimony contradicted the stipulation but merely supplemented it. The stipulation gave only a general account of what transpired and did not completely explain the physical evidence; Dr. Young's

testimony provides in more detail his opinion as to how the accident occurred.  Therefore, we hold that the district court did not abuse its discretion in denying Habecker's motion to strike Dr. Young's testimony.

V.

Thus, for the foregoing reasons we will vacate the district court's judgment on the verdict and remand for a new trial.